# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION – CAPE GIRARDEAU

| | |
|---|---|
| MAGNITUDE 7 METALS LLC, )<br><br>    *Plaintiff,* )<br><br>vs. )<br><br>ACE AMERICAN INSURANCE COMPANY; )<br>HDI GLOBAL INSURANCE COMPANY; )<br>IRONSHORE SPECIALTY INSURANCE )<br>COMPANY; GENERAL SECURITY )<br>INDEMNITY COMPANY OF ARIZONA; )<br>HDI GLOBAL SPECIALTY SE (UK); and )<br>CERTAIN UNDERWRITERS AT LLOYD'S, )<br>LONDON; )<br><br>    *Defendants.* )<br>_____ ) | Case No. 1:23-cv-186 _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, Magnitude 7 Metals LLC ("M7M"), sues Defendants (collectively "Defendants" or "Insurers"), ACE American Insurance Company ("ACE"); HDI Global Insurance Company ("HDI"); Ironshore Specialty Insurance Company ("Ironshore"); General Security Indemnity Company of Arizona ("GSICOA"); HDI Global Specialty SE (UK) ("HDI Specialty"); and Certain Underwriters at Lloyd's, London ("Lloyd's"); and states as follows:

## NATURE OF THE ACTION

1.     This is an action for declaratory relief, breach of contract, and vexatious refusal to pay, arising out of the Insurers' continuing refusal to timely adjust and pay for

property damage and business interruption losses as required by the terms of commercial property insurance policies they issued to M7M.

2.    M7M operates an aluminum smelting facility in Marston, Missouri. Aluminum is produced in pots of liquefied metal that must consistently maintain extreme temperatures. When power to the pots is reduced or interrupted, the pots begin to cool and the metal starts to freeze. The temperature changes place stress on the pots' inner carbon lining and cathodes that can cause permanent physical damage. Pots that sustain such damage cannot be repaired to their pre-loss condition.

3.    M7M suffered two independent events that interrupted power to all pots in operation. On or about August 3-4, 2019, M7M suffered a complete loss of power to Potline 1 for over six hours, causing irreparable physical damage to at least 123 of the 158 operational pots. On or about November 21, 2019, M7M suffered a complete loss of power to Potline 2 for over one hour, and was forced to resume operation of some pots at reduced power for several weeks, causing irreparable physical damage to at least 135 of the 158 operational pots.

4.    The Insurers initially accepted coverage for damage to both potlines, and for many months, they claimed to be "determining the appropriate measurement for claimed pot damage." The Insurers wrongfully concluded, however, that the majority of pots sustained no physical damage. The Insurers also incorrectly determined that the Policy's deductible for business interruption ("Time Element") losses must be calculated for the entire facility, and not for each potline individually, as the Policy requires. After

recognizing their potential exposure, the Insurers reversed their initial coverage position and now refuse to pay anything more than the cost of restoring damaged pots to operation.

5.      M7M seeks a declaration that the policies issued by Defendants require payment of actual cash value or replacement cost value for all damaged pots that cannot be restored to their pre-loss condition. M7M also seeks a declaration that such policies' Time Element deductible must be independently calculated for Potline 1 and Potline 2 because they are separate insured locations.

6.      M7M also seeks compensatory and consequential damages for the Insurers' breach of contract, as well as extra-contractual damages, including statutory and/or punitive damages or penalties, pre-judgment interest, attorneys' fees and costs, to the maximum extent permitted by Sections 375.296, 375.420, or other applicable law, for the Insurers' vexatious refusal to adjust and pay amounts due under the policies without reasonable cause or excuse.

## THE PARTIES

7.      M7M is a Delaware limited liability company that owns and operates an aluminum smelting plant in Marston, Missouri.

8.      Upon information and belief, ACE is incorporated under the laws of Pennsylvania and maintains its principal place of business in Pennsylvania.  ACE transacts business in Missouri and contracted to insure M7M's property located in Missouri.

9.      Upon information and belief, HDI is incorporated under the laws of Illinois and maintains its principal place of business in Illinois.  HDI transacts business in Missouri and contracted to insure M7M's property located in Missouri.

3

10.    Upon information and belief, Ironshore is incorporated under the laws of Arizona and maintains its principal place of business in Massachusetts.  Ironshore transacts business in Missouri and contracted to insure M7M's property located in Missouri.

11.    Upon information and belief, GSICOA is incorporated under the laws of Arizona and maintains its principal place of business in New York. GSICOA transacts business in Missouri and contracted to insure M7M's property located in Missouri.

12.    Upon information and belief, HDI Specialty is a company organized under the laws of United Kingdom and maintains its principal place of business in London, England.  HDI Specialty transacts business in Missouri and contracted to insure M7M's property located in Missouri.

13.    Lloyd's is the group of syndicates subscribing to insurance policies providing coverage to M7M effective April 17, 2019.  These policies are believed to be identified with policy numbers PRPNA1902965, PRPNA1903368, PRPNA1903369, PRPNA1903370, PRPNA1903371, PRPNA1903372, and PRPNA1903373.  Upon information and belief, none of the Lloyd's syndicates were incorporated in Missouri, and none maintain a principal place of business in Missouri.  Lloyd's transacts business in Missouri and contracted to insure M7M's property located in Missouri.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction pursuant to Sections 527.010 *et seq*., RSMo., and Rules 87.01 *et seq*. of the Missouri Rules of Civil Procedure.

15.     Venue is proper in this judicial circuit pursuant to Section 508.010, RSMo, because all of the Insurers are foreign insurance companies deemed to reside in this judicial circuit.

## GENERAL ALLEGATIONS

### M7M Revives the Aluminum Smelting Facility in Marston, Missouri

16.     The aluminum smelting plant located at 391 St. Jude Industrial Park Highway in Marston, Missouri was originally constructed in 1968 and operated continuously until 2016, when its prior owner, Noranda, Inc., filed for bankruptcy.

17.     M7M purchased the plant and resumed primary aluminum production in June 2018.  At that time, there were only two other companies – Alcoa and Century Aluminum – operating primary aluminum smelters in the United States, and domestic production of primary aluminum was at its lowest point since 1951.[1]

18.     Aluminum is produced in carbon-lined pots containing a molten salt bath. Electrical current passes through the bath and converts aluminum oxide (alumina) into molten aluminum that is periodically siphoned out of the pot.  The process requires a massive amount of electricity, as the pots must consistently maintain the extreme temperatures necessary to keep the metal liquefied.

19.     M7M operates two potlines at the plant – Potline 1 and Potline 2 – each with 174 pots available for production capacity.  Each potline is powered by its own group of

---

[1] M. Platzer, *Effects of U.S. Tariff Action on U.S. Aluminum Manufacturing*, Cong. Research Serv. (Oct. 9, 2018), available at https://fas.org/sgp/crs/misc/IF10998.pdf (last visited Apr. 21, 2020).

on-site rectifiers that receive alternating current (AC) power from the utility provider and convert it to the direct current (DC) power used to support the potline.

20.    M7M relied on expansive all-risk insurance coverage for property damage and business interruption to protect against the significant operational risks inherent to the aluminum smelting process.  As a startup operator attempting to revive a previously bankrupt facility, any production delay – much less a catastrophic loss – could have produced an existential crisis.  Both M7M and its insurers knew that such events were common occurrences; at the time they underwrote the policies they issued to M7M, the Insurers knew or should have known that under Noranda's ownership, the Marston plant suffered significant losses related to power outages in 2009 and 2016, as well as an explosion in 2015, that hastened the company's demise.[2]

### M7M Purchased All-Risk Property Insurance with Replacement Cost Coverage

21.    M7M purchased commercial property insurance policies from the Insurers effective April 17, 2019 through April 17, 2020.  Each insurer assigned a unique policy number, set their own premium, and assumed a percentage of the $25,000,000 per occurrence limit, as follows:

---

[2] J. Barker, *Noranda Aluminum Closure Marks the End of an Era in the Missouri Bootheel*, St. Louis Post-Dispatch (Feb. 21, 2016), available at https://www.stltoday.com/business/local/noranda-aluminum-closure-marks-the-end-of-an-era-in/article_335027a8-2a8b-591f-9f9c-aaabbffab0a0.html (last visited Aug. 7, 2020).

| Insurer | Policy No. | Risk[3] |
|---|---|---|
| Lloyd's | Various | 48% |
| ACE | PGLN14330690 | 13% |
| HDI | CPD5478401 | 10% |
| Ironshore | 003545401 | 10% |
| GSICOA | FA0042562-2019-1 | 5% |
| HDI Specialty | PRPNA1903366 | 3% |
| Endurance[4] | ARP30001041600 | 2% |

22.    Except for the Insurers' respective coverage limits, there are no material differences in the coverage provided by the Insurers' policies, and each insurer is bound by the same terms and conditions with respect to the losses identified herein. The Insurers' policies are accordingly referenced collectively as "the Policy" throughout, and an exemplar copy of the ACE policy is attached as Exhibit A.

23.    The Policy provides all-risk commercial property coverage: "This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy." Exhibit A at 1, Declarations.

24.    The Policy's $25,000,000 coverage limit applies to "Pot Line Freeze, Property Damage and Time Element, combined." *Id.* at 4, Applicable Limits of Liability/Time Limits.

25.    The Policy's coverage limit is subject to a deductible of "$1,000,000 for Property Damage and 45 Day Equivalent for Time Element." *Id.* at 5, Deductibles.

---

[3] M7M self-insured the remaining 9% of the risk.

[4] Endurance American Specialty Insurance Company has been dismissed from this action.

26.    The Policy excludes "deterioration, depletion, rust, corrosion or erosion, wear and tear, inherent vice or latent defect," but this exclusion does not apply to covered property damage that results from any of these causes of loss.  *Id.* at 11-12, Exclusions ("This Policy excludes the following, but, if physical damage not excluded by this Policy results, then only that resulting damage is covered.").

27.    Payment under the Policy is determined by the Valuation Clause, which states, in pertinent part, that "adjustment of physical loss to property will be subject to the following:

> H.    On all other property, the lesser of the following:
>    1)    the cost to repair;
>    2)    the cost to rebuild or replace on the same site with new materials of like size, kind and quality.
>                  * * *
>    8)    The **actual cash value** if such property is:
>        a)    useless to the Insured; or
>        b)    not repaired, replaced or rebuilt on the same or another site within two years from the date of loss, unless such time is extended by the Company.

> The Insured may elect not to repair or replace the insured real or personal property lost, damaged or destroyed. Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expended on other capital expenditures related to the Insured's operations within two years from the date of loss. As a condition of collecting under this item, such expenditure must be unplanned as of the date of loss and be made at an insured location under this Policy. This item does not extend to DEMOLITION AND INCREASED COST OF CONSTRUCTION.

*Id.* at 13-15, Valuation (emphasis in original).

28.    The Policy also provides Time Element coverage for economic losses sustained during a period of business interruption caused by a covered occurrence.  *Id.* at 31-34, Time Element.

29.    The Policy's Time Element "45 Day Equivalent" deductible is calculated for the insured "location" where the Time Element loss occurs, pursuant to Deductible General Provisions, Section F., which states:

> When a % deductible is stated above, whether separately or combined, the deductible is calculated as follows:
> * * *
>
> Time Element – % of the full Time Element values that would have been earned in the 12 month period following the **occurrence** by use of the facilities at the **location** where the physical damage happened, plus that proportion of the full Time Element values at all other **locations** where TIME ELEMENT loss ensues that was directly affected by use of such facilities and that would have been earned in the 12 month period following the **occurrence**.

*Id.* at 6 (emphasis in original).

30.    The Policy's definition of "day equivalent" further specifies that the Time Element deductible is calculated as "the 100% daily Time Element value that would have been earned following the **occurrence** at the **location** where the physical damage happened . . . ."  *Id.* at 58, Definitions.

31.    The Policy defines "location" to be "as specified in the Schedule of Locations on file with the Company."  *Id.* at 59, Definitions.  The Policy's Schedule of Forms does not incorporate a Schedule of Locations into the Policy.  *Id.*, Schedule of Forms and Endorsements.  Upon information and belief, the "Schedule of Locations" on file with the

9

Defendants identifies "Potline 1A & 1B" and "Potline 2A & 2B" as separate insured locations.

### Loss #1:  R17 Failure & Power Interruption to Potline 1 on August 3-4, 2019

32.    On or about Saturday, August 3, 2019, rectifier "R17" failed at approximately 11:36 p.m., causing a complete loss of power to Potline 1.  M7M could not restore power until the following morning on Sunday, August 4, 2019, at approximately 5:30 a.m., and additional power interruptions continued into the following morning.

33.    As a result of the R17 failure, Potline 1 suffered a total loss of power for more than 5 hours and 54 minutes, and was not fully stabilized for another twenty hours.

34.    Potline 1 had 158 pots in operation at the time of the power interruption. Components inside these pots sustained physical damage as a result of the power interruption and cannot be repaired to their pre-loss condition.

35.    Of the 158 pots, 62 had "frozen" bath and were removed from service. These 62 frozen pots suffered permanent and irreparable damage to their carbon cathodes, and cannot be restored to their pre-loss condition. M7M, nonetheless, attempted to mitigate its business interruption loss by remediating the damage and restarting these pots at its own expense.

36.    The remaining 96 pots were re-energized and restored to operation, but suboptimal conditions over an extended period of time placed stress on the pots' interior lining. At least 61 of these pots sustained permanent and irreparable damage and cannot be restored to their pre-loss condition.

37.    From the R17 failure through July 30, 2021, Potline 1 sustained numerous premature and unexpected failure events, requiring additional restarts and at least 40 replacements.

***Loss #2:  R21 Failure & Power Interruption to Potline 2 on November 21, 2019***

38.    On or about Thursday, November 21, 2019, rectifier "R21" failed at approximately 4:52 a.m., causing a complete loss of power to Potline 2.  M7M partially restored power at approximately 5:59 a.m., resulting in a total outage of about 1 hour and 6 minutes.

39.    Potline 2 had 158 pots in operation at the time of the power interruption.  To stabilize Potline 2 with partial power, M7M had to remove 15 of the most severely damaged pots from operation.  These pots suffered permanent and irreparable damage and cannot be restored to their pre-loss condition.

40.    M7M was able to gradually restore operation of the remaining 143 pots on Potline 2 by reducing the amperage from ~173kA to ~143kA, and increasing the voltage from ~4.6 volts per cell to a range of ~4.9-5.2 volts per cell.

41.    M7M could not fully restore power until approximately January 10, 2020. During this period of several weeks, M7M took reasonable and necessary action to mitigate potentially larger covered losses by continuing to operate Potline 2 under stressful conditions.  At least 120 of the remaining 143 pots in operation during this time sustained permanent and irreparable damage and cannot be restored to their pre-loss condition.

42.    From the R21 failure through July 30, 2021, Potline 2 sustained numerous premature and unexpected failure events, requiring additional restarts and at least 44 replacements.

### *The Insurers Refuse Replacement Cost Coverage for All Irreparably Damaged Pots*

43.    M7M timely notified the Insurers of claims for property damage and related losses arising out of the R17 and R21 failures and resulting power interruptions.

44.    M7M permitted the Insurers to inspect the facility and fully cooperated with the Insurers' investigation of the losses.

45.    On or about November 13, 2019, at the Insurers' request, M7M submitted a sworn proof of loss for unallocated advance payment, and thereafter the Insurers tendered an advance payment of $1,820,000.00 with respect to the R17 loss.

46.    The Insurers' advance payment was based on a "Preliminary Estimate of Repair Costs" that included a rebuild of 4 pots at a replacement cost value ("RCV") of $235,212.00 for each pot.

47.    M7M's expert has estimated a lower RCV cost of $214,550 per pot. Applying this lower RCV estimate to the documented irreparable pot damage, the replacement cost owed far exceeds the Policy's $25,000,000 per occurrence limits for both the R17 loss and the R21 loss, as follows:

| R17 Loss – August 3-4, 2019 | | |
|---|---|---|
| Type of Pot Damage | RCV Per Pot | Total RCV |
| 62 frozen pots | $214,550 | $13,302,100 |
| 61 re-energized pots | $214,550 | $13,087,550 |
| **Total RCV for 123 Total Pots** | | $26,389,650 |

| R21 Loss – November 21, 2019 | | |
|---|---|---|
| Type of Pot Damage | RCV Per Pot | Total RCV |
| 15 frozen pots | $214,550 | $3,218,250 |
| 120 re-energized pots | $214,550 | $25,746,000 |
| **Total RCV for 135 Total Pots** | | $28,964,250 |

48.     On December 2, 2019, the Insurers issued a reservation of rights letter with respect to the R17 loss, stating that "[Potline 1] pots damaged as a result of [the R17 failure] are likely covered." The Insurers claimed to be "currently determining the appropriate measurement for claimed pot damage."

49.     In their December 2, 2019 letter, the Insurers incorrectly stated that the re-energized pots were "undamaged" and failed to address payment based on the Policy's actual cash value and replacement cost value coverage.

50.     The Insurers further stated that the Policy's Time Element deductible would be calculated for the entire "Facility" and "not calculated on an individual potline basis."

51.     On March 3, 2020, the Insurers issued a reservation of rights with respect to the R21 loss, stating that "[Potline 2] pots damaged as a result of R21's arcing event are likely covered."  The Insurers, however, offered no advance payment on R21 and stated that "costs associated with M7M's pot damage remain speculative."

52.     At the time of this filing, the Insurers have made no additional payment on the R17 loss beyond the $1,820,000 advance, and have paid nothing on the R21 loss.

53.     M7M timely submitted a written proof of loss and demand to the Insurers in the amount of $43,680,000, representing the remaining coverage limits of $20,930,000 for the R17 loss and $22,750,000 for the R21 loss.

54.     Due to the Insurers' refusal to adjust and pay amounts due under the Policy, M7M was forced to retain undersigned counsel to seek recovery and is obligated to pay their reasonable attorneys' fees and costs associated with this representation.

55.     All conditions precedent to bringing this action were performed, waived, excused, or have otherwise occurred.

## COUNT I – DECLARATORY JUDGMENT

56.     M7M re-alleges paragraphs 1-55 as if fully set forth herein.

57.     The R17 failure and resulting power interruption to Potline 1 on or about August 3-4, 2019, and the R21 failure and resulting power interruption to Potline 2 on or about November 21, 2019, constitute two separate occurrences under the Policy.

58.     The Insurers acknowledged separate coverage for the losses arising out of damage to Potline 1 as a result of the R17 failure and Potline 2 as a result of the R21 failure.

59.     There is a present and justiciable controversy as to whether M7M is entitled to payment from the Insurers under the Policy of repair costs, actual cash value, and/or replacement cost value for at least 123 pots on Potline 1 that were damaged as a result of the R17 failure.

60.     There is a present and justiciable controversy as to whether M7M is entitled to payment from the Insurers under the Policy of repair costs, actual cash value, and/or replacement cost value for at least 135 pots on Potline 2 that were damaged as a result of the R21 failure.

61.    There is a present and justiciable controversy as to whether the Potline 1 and Potline 2 are separate locations, as identified in the Policy's Schedule of Locations, such that the Policy's Time Element deductible must be calculated separately for each potline.

WHEREFORE, Plaintiff Magnitude 7 Metals LLC respectfully requests entry of judgment against Defendants Ace American Insurance Company; HDI Global Insurance Company; Ironshore Specialty Insurance Company; General Security Indemnity Company of Arizona; and Certain Underwriters at Lloyd's, London; declaring:

(1)    the Policy requires payment to M7M of actual cash value or replacement cost value for all irreparably damaged pots – *i.e.*, pots that cannot be repaired to their pre-loss condition, which includes their expected life span;

(2)    the Policy requires payment to M7M of actual cash value for all irreparably damaged pots without respect to whether they are rebuilt or replaced;

(3)    the Policy requires payment to M7M of replacement cost value for all irreparably damaged pots that are rebuilt or replaced within 2 years or longer, if agreed by the parties;

(4)    the Policy also requires payment to M7M of replacement cost value for all irreparably damaged pots if M7M uses the proceeds for other capital expenditures related to its operations within two years from the date of loss;

(5)    the Policy's Time Element deductibles must be independently calculated for Potline 1 and Potline 2, as each potline is a separate insured location identified on the Policy's Schedule of Locations;

and awarding attorney's fees, costs, pre- and post-judgment interest, pursuant to RSMo. § 527.100 or applicable law, and any other relief this Court deems equitable, just and proper.

<u>**COUNT II – BREACH OF CONTRACT**</u>

62.    M7M re-alleges paragraphs 1-55 as if fully set forth herein.

63.    The Policy is a valid and enforceable contract under Missouri law.

64.    The Policy states that, in the event of covered property damage, the Insurers will pay the lesser of repair costs, actual cash value (if the property is not replaced), or replacement cost value (if the property is replaced).

65.    M7M sustained covered property damage to at least 258 pots as a result of the R17 and R21 losses. These pots were permanently damaged and cannot be repaired to their pre-loss condition, so the Insurers are required to pay actual cash value or replacement cost value for these damaged pots.

66.    The Insurers have breached the Policy by refusing to timely adjust and pay amounts due.

67.    As a direct, foreseeable, and proximate result of the Insurers' breach, M7M has been forced to delay replacement of pots and maintain operations at suboptimal conditions, causing millions of dollars of damages in the form of increased operating costs and reduced production value.

68.    M7M has been damaged and continues to incur damages as a direct, foreseeable, and proximate result of the Insurers' breach.

WHEREFORE, Plaintiff Magnitude 7 Metals LLC respectfully requests entry of judgment against Defendants Ace American Insurance Company; HDI Global Insurance

Company; Ironshore Specialty Insurance Company; General Security Indemnity Company of Arizona; and Certain Underwriters at Lloyd's, London for compensatory and consequential damages, pre- and post-judgment interest, attorneys' fees and costs pursuant to applicable law, and any further relief this Court deems equitable, just, and proper.

### COUNT III – VEXATIOUS REFUSAL TO PAY
### SECTIONS 375.296 & 375.420, RSMo.

69.     M7M re-alleges paragraphs 1-55 as if fully set forth herein.

70.     The Policy states that the Insurers will pay for covered property damage at the lesser of (1) the cost to repair, (2) the cost to rebuild or replace, or (3) actual cash value if the property is not repaired, replaced or rebuilt.

71.     Missouri law firmly establishes that the Insurers' cannot elect to pay repair costs unless the damaged property can be restored to its pre-loss condition.[5]

72.     M7M sustained permanent and irreparable damage to 77 pots that were "frozen" – *i.e.*, shut down and cooled to ambient temperature – as a result of the R17 and R21 power interruptions.

---

[5] *Barton v. Farmers Ins. Exchange*, 255 S.W. 2d 451, 456-57 (Mo. Ct. App. 1953) ("Certainly it was appellant's duty, if it elected to repair instead of pay, to put the automobile in as good a condition both in appearance and mechanically as it was prior to the upset"); *Camden v. State Farm Mut. Auto. Ins. Co.*, 66 S.W.3d 78, 83 (Mo. Ct. App. E.D. 2001) (citing *Groves v. State Farm Mut. Auto Ins. Co.*, 540 S.W.2d 39, 43 (Mo. 1976) (en banc)) ("damage was such that full and adequate repairs would have been impossible, therefore making the repair payment option not feasible"); *Lupo v. Shelter Mut. Ins. Co.*, 70 S.W.3d 16, 21-23 (Mo. Ct. App. 2002) (under repair provision, damaged property must be restored to "substantially the same physical and mechanical condition as existed immediately prior to the accident"); *see also* COUCH ON INS. 3d § 176:4 (2019) ("[a]s a condition to the exercise of the election to repair or rebuild, it is essential that the property be in such a condition that it can be repaired or rebuilt and thereby restored to its condition prior to the loss").

73.    The Insurers retained Mr. Alton Tabereaux as a consulting expert on the physical damage to M7M's potlines caused by R17 and R21 power interruptions. Mr. Tabereaux advised the Insurers that the 77 frozen pots sustained permanent damage due to the power interruptions and cannot be repaired to their pre-loss condition.

74.    Mr. Tabereaux reported that the frozen pots sustained cooling cracks, which will weaken the carbon cathodes and cause the pots to fail prematurely:

> This is the key point in cathode damage. If you cool the pot all the way to ambient, you let the pot cool down to room temperature, we have cracks form in the top surface of the cathode blocks. We call these cooling cracks.
> And they're – it can be anywhere from four to six to eight cracks on the cathode lining, the entire cathode surface. And these weaken the cathode.
> Most of them will – when we restart the pot, these cracks will close up, and you're okay. But in the long run, some cracks would let liquid aluminum go down inside the cathode lining, and it weakens the cathode.
> And as a result, we generally say that we lose 360 days, 365 days in your pot life due to these crack formations.

75.    Mr. Tabereaux has published extensively on the subject of potline damage due to power interruption and consistently concluded that cooling cracks in frozen pots cannot be repaired.

76.    The Insurers, despite this knowledge, have vexatiously refused to pay ACV or RCV for M7M's 77 frozen pots without reasonable cause.

77.    M7M also sustained permanent and irreparable damage to the side walls and end walls of at least 181 re-energized pots.

78.    The Insurers are aware that Mr. Tabereaux previously found the same type of side wall and end wall damage in re-energized pots following a power interruption at

this same facility, and he concluded that these damaged pots sustained a loss of life and could not be repaired to pre-loss condition.

79.    The Insurers have vexatiously refused to pay ACV or RCV for the permanent and irreparable damage to at least 181 of M7M's re-energized pots without reasonable cause.

80.    The Insurers vexatious refusal to adjust and pay these claims is further established by their violation of good faith standards for claims handling conduct, in conscious disregard of applicable Missouri law and regulations, including:

(a) Misrepresenting the terms of their Policy and well-settled Missouri law in an effort to limit their liability to repair costs, in violation of Section 375.1007(1) and 20 Mo. C.S.R. § 100-1.020(1)(A);

(b) Failing to acknowledge and respond to M7M's pertinent communications with reasonable promptness, and to provide required updates on the status of their claim investigation, in violation of Section 375.1007(2), 20 Mo. C.S.R. § 100-1.030(1)(B), and 20 Mo. C.S.R. § 100-1.050(1)(C);

(c) Failing to adopt and implement reasonable standards for the prompt investigation and settlement of claims, in violation of Section 375.1007(3);

(d) Not attempting in good faith to effectuate prompt, fair and equitable settlement of M7M's claims after liability has become reasonably clear, in violation of Section 375.1007(4);

(e) Compelling M7M to institute this action to recover amounts due under its policies by offering substantially less than the amounts ultimately recovered, in violation of Section 375.1007(5);

(f) Refusing to pay claims without conducting a reasonable investigation, in violation of Section 375.1007(6);

(g) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed and communicated to the insurer, in violation of Section 375.1007(7);

(h) Making a claims payment to M7M without indicating the coverage under which each payment is being made, in violation of Section 375.1007(10);

(i) Unreasonably delaying the investigation or payment of M7M's claims by requiring unnecessary and duplicative information, in violation of Section 375.1007(11);

(j) Failing in the case of claims denial or offers of a compromise settlement to promptly provide a reasonable and accurate explanation of the basis for such actions, in violation of Section 375.1007(12);

(k) Failing to provide M7M with forms necessary to present claims and reasonable explanations regarding their use, within fifteen calendar days of a request, in violation of Section 375.1007(13).

81.    The Insurers' ongoing refusal to adjust and pay for the R17 and R21 losses is willful and without reasonable cause.

20

82.   As a direct, foreseeable, and proximate result of the Insurers' ongoing vexatious refusal to pay for the R17 and R21 losses, M7M has suffered and continues to suffer damages.

WHEREFORE, Plaintiff Magnitude 7 Metals LLC respectfully requests entry of judgment against Defendants ACE American Insurance Company ("ACE"); HDI Global Insurance Company; Ironshore Specialty Insurance Company; General Security Indemnity Company of Arizona; HDI Global Specialty SE (UK); and Certain Underwriters at Lloyd's, London; for compensatory damages; statutory damages, punitive damages, and/or penalties in the maximum amount permitted by Sections 375.296 & 375.420, RSMo., or other applicable law; attorney's fees and costs; pre- and post-judgment interest; and any further relief this Court deems equitable, just, and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs request trial by jury of all issues so triable.

Dated this 20th day of October, 2023.

Respectfully submitted,

VER PLOEG & MARINO, P.A.
100 S.E. Second Street, Suite 3300
Miami, FL 33131
305-577-3996
305-577-3558 *facsimile*

/s/ Benjamin C. Hassebrock
**Benjamin C. Hassebrock, Esq.**
Missouri Bar No.: 59727
bhassebrock@vpm-legal.com
pmartinez@vpm-legal.com
*Counsel for Plaintiff*